Patrick M. Flatley
United States Bankruptcy Judge
Dated: Wednesday, March 28, 2012 2:19:14 PM

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

IN RE:                                      )
                                            )
THOMAS SONNTAG and                          )
HEATHER SONNTAG,                            )    Case No. 10-1749
                                            )
          Debtors.                          )    Chapter 7
                                            )

**MEMORANDUM OPINION**

The United States Trustee (the "USTE") seeks dismissal of the bankruptcy case of Thomas and Heather Sonntag (the "Debtors") based on the totality of the Debtors' financial circumstances under 11 U.S.C. § 707(b)(3).[1]

The court will grant the USTE's motion to dismiss under § 707(b)(3) for the reasons stated herein.

**I. BACKGROUND**

The Debtors filed a voluntary Chapter 7 bankruptcy petition on August 13, 2010. The Debtors have been married for approximately eleven years and have two children, ages four and two. Mr. Sonntag has been employed by Gall Zeidler Consultants, LLC, for over five years; Ms. Sonntag has been employed by Prospect Waterproofing for about ten years. According to Form 22A, the

---

[1] This Court in an earlier Memorandum Opinion denied relief under 11 U.S.C. § 707(b)(2), and reserved ruling on the USTE's basis for dismissal under § 707(b)(3). (Doc. No. 38). The court set an evidentiary hearing to allow the Debtors and USTE to present evidence on the totality of the Debtors' circumstances.

1

Debtors have combined gross monthly wages of $11,820, or $141,840 annually. The Debtors do not expect any significant change in their income for the foreseeable future. After accounting for mandatory deductions, the Debtors' annual salary is $108,243 per year. According to Schedules D and F respectively, the Debtors list secured debt of $376,784 and unsecured debt of $87,782. Against their monthly net income, the Debtors disclose on Schedule J monthly expenses totaling $9,771, leaving a negative monthly budget of $751. Schedule J lists eleven expenses: (1) payments on two mortgages totaling $2,641; (2) home owner association fees of $160; (3) utilities (electricity, water, sewer, telephone, cable, internet, and gas) totaling $787; (4) a $2,500 rental payment; (5) food expenses of $1,200; (6) auto payments totaling $642; (7) total insurance payments (rent and auto) of $292; (8) medical payments of $171; (9) child care expense of $960; (10) transportation expenses of $200; and (11) $200 in recreation and entertainment expenses.

Before filing their bankruptcy petition on August 13, 2010, the Debtors owned a home in Charles Town, West Virginia (the "Charles Town property"). The Debtors valued the Charles Town property at $249,900, against which Wells Fargo had two deeds of trust securing an aggregate amount of $353,943. In 2009 the Debtors attempted a short sale of the Charles Town property, but Wells Fargo rejected the two offers received. Wells Fargo also denied the Debtors' attempt to modify their loans. In April 2010, the Debtors stopped making payments on the Charles Town property. In July 2010, the Debtors moved to Ashburn, Virginia and entered into a yearly lease agreement for $2,500 a month. The Debtors testified that they moved to be closer to work. The Charles Town property was eventually sold at a foreclosure in February 2011 for approximately $215,000.[2] Thus, the Debtors are no longer obligated to pay the two mortgage payments and home owner association fees, totaling $2,801 a month. The Debtors monthly expenses have therefore decreased to $6,970, leaving a positive monthly budget of $2,050.

The USTE asserted that under § 707(b)(2) the Debtors improperly claimed the Charles Town property payment on Form 22A because they no longer incurred that expense. In an earlier

---

[2] Looking to Schedules A and D, and Trustee's Report of Sale, there is a deficiency judgment for the sale of the Charles Town property for approximately $138,943. The Debtors' Schedule F states that creditors hold $87,782 in unsecured nonpriority claims. Combining the Schedule F unsecured nonpriority claims and the deficiency judgment of Wells Fargo, the Debtors have approximately $226,725 of unsecured debt.

2

decision, the court rejected this argument and determined that debtors who surrender secured property before filing bankruptcy are permitted to deduct those payments under § 707(b)(2)(A)(iii). The court reasoned that debtors who surrender secured property are permitted to expense payments in the means test calculation given that these payments are "scheduled as contractually due" under the plain meaning of § 707(b)(2)(A)(iii)(I). But this Court acknowledged that debtors who will not be incurring a mortgage payment in the future is a proper consideration in ruling on a motion to dismiss for abuse under § 707(b)(3)(B).

## II. DISCUSSION

The USTE argues that the Debtors' financial situation demonstrates abuse under the "totality of the circumstances" pursuant to § 707(b)(3)(B) because the Debtors have an ability to repay their debts outside bankruptcy or under another chapter of the Bankruptcy Code (the "Code"). The USTE bears the burden under § 707(b)(3)(B) to demonstrate that the totality of the Debtors' circumstances indicates abuse. *In re Walker*, 383 B.R. 830, 836 (Bankr. N.D. Ga. 2008). The USTE's principal argument is that the Debtors' Schedule J improperly includes a $2,801 expense for the Charles Town property because the Debtors surrendered that property by the petition date, and that by accounting for this "phantom expense" the Debtors have substantial disposable income to pay creditors. The USTE further contends that this ability to pay alone, absent other factors, is sufficient for the court to find this case abusive.

The Debtors assert that this case cannot be dismissed solely on their ability to pay under § 707(b)(3)(B). The Debtors maintain that ability to pay is but one consideration in the totality of circumstances test, as set forth in *Green v. Staples (In re Green)*, 934 F.2d 568, 570 (4th Cir. 1991). The Debtors posit that the public policy underpinnings of the Code, such as ensuring a "fresh start" for debtors, dictates that other factors be considered in determining a motion to dismiss under § 707(b)(3)(B), and that consideration of those factors renders their case non-abusive.

A well-settled maxim of bankruptcy law is to "grant a 'fresh start' to the 'honest but unfortunate debtor.'" *Marrama v. Citizens Bank*, 549 U.S. 365, 367 (2007) (citation omitted). At the same time, the Code is not a vehicle to gain a "head start" as opposed to a "fresh start." *See, e.g.*, *Green v. Staples (In re Green)*, 934 F.2d 568, 570 (4th Cir. 1991); *In re Talley*, 389 B.R. 741, 745 (Bankr. W.D. Wash. 2008). This intent of bankruptcy law "reflects the dual purpose of bankruptcy

3

as both a mechanism for debtor relief and for the collection of debts." *In re Smith*, Case. No. 09-691, 2009 WL 4262842, *1 (Bankr. N.D.W. Va. 2009).

The provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") substantially amended Chapter 7 relief under the Code. Pub. L. No. 109-8, 119 Stat. 23. Congress amended the Code "to ensure that debtors repay creditors the maximum they can afford."[3] H.R. Rep. No. 109-31, pt. 1, at 2 (2005). The most notable BAPCPA amendment came under § 707(b): the threshold for dismissal was changed from "substantial abuse" to "abuse"; § 707(b)(2) and (3) were added; and the statutory presumption in favor of granting a debtor's discharge was displaced by a presumption against debtors who fail the means test. *See generally* Hon. Eugene R. Wedoff, *Means Testing In The New* § 707(b), 79 Am. Bank. Inst. L.J. 231, 231-40 (discussing the changes to § 707(b)). These modifications, and others within the Code, were principally meant to curb perceived abuses by Chapter 7 debtors who had the ability to repay their creditors. *See In re Singletary*, 354 B.R. 455, 459 (Bankr. S.D. Tex. 2006) (remarking that Congress was concerned with debtors receiving a full discharge under Chapter 7 while having regular income that could be used to pay creditors in a Chapter 13 plan).

Section 707(b)(3)(B)[4] codifies the totality of circumstances test – a pre-BAPCPA judicially

---

[3] Numerous courts have similarly commented that the intent behind BAPCPA was to ensure debtors pay back as much as they can afford. *See, e.g.*, *Ransom v. FIA Card Services*, __ U.S. __, 131 S.Ct. 716, 721 (2011) ("In particular, Congress adopted the means test . . . to help ensure that debtors who *can* pay creditors *do* pay them.") (emphasis in original); *In re Kibbe*, 361 B.R. 302, 314 (B.A.P. 1st Cir. 2007) (same); *Pak v. eCast Settlement Corp. (In re Pak)*, 378 B.R. 257, 265 (B.A.P. 9th Cir. 2007) (Klein, J., concurring) (same); *In re Briscoe*, 374 B.R. 1, 8 (Bankr. D. Col. 2007) (same).

[4] In full, § 707(b)(3) provides:

"(3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this Chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider–

"(A) whether the debtor filed the petition in bad faith; or

"(B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse."

4

constructed standard. Before BAPCPA, courts looked to the totality of the debtor's circumstances to determine whether the case should be dismissed for "substantial abuse." *In re Pak*, 343 B.R. 239, 243 (Bankr. N.D. Cal. 2006) ("Prior to BAPCPA, courts considered whether to dismiss a consumer case for 'substantial abuse' under section 707(b)(1) based on the 'totality of the circumstances.'") (citation omitted). Rules of construction direct that an amendment to a statute is not to be interpreted as abrogating prior case law unless the alteration is evident from the language and context of the amendment. *See Southern Utah Wilderness Alliance v. BLM*, 425 F.3d 735, 763 (10th Cir. 2005). And where Congress promulgates statutes embodying existing case law, it is "well established" that those prior holdings provide the guiding light for interpreting the statute. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-23 (1992) (internal quotation marks omitted). In areas where BAPCPA incorporates common law rules, the "statutory terms must be read as embodying their common law meaning." *Southern Utah*, 425, F.3d at 763. Thus, pre-BAPCPA case law applying a totality of circumstances analysis is an important guidepost to construe § 707(b)(3)(B). *In re Pfiefer*, 365 B.R. 187, 191 (Bankr. D. Mont. 2007) ("Because Congress retained the phrase 'totality of the circumstances' in BAPCPA, the Court concludes that it may look to pre-BAPCPA case law to construe the meaning of that phrase under § 707(b)(3).").

Prior to BAPCPA, the Court of Appeals for the Fourth Circuit in *Green v. Staples* adopted a "totality of the circumstances" test for determining whether substantial abuse existed. 934 F.2d at 572-3. The court in *Green* rejected the argument that a case should be dismissed based solely on a debtor's ability to pay. *Id.* at 573. Instead, the court held that the totality of circumstances test involves an examination of factors such as:

> (1) Whether the bankruptcy petition was filed because of illness, calamity, disability or unemployment;
> (2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;
> (3) Whether the debtor's proposed family budget is excessive or unreasonable;
> (4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the debtor's true financial condition; and
> (5) Whether the petition was filed in good faith.

*Id.* at 572.

The factors enunciated in *Green* remain informative. *In re Smith*, 2009 WL 4262842, *4 n.5; *see, e.g.*, *In re Hornung*, 425 B.R. 242, 250 (Bankr. M.D.N.C. 2010) (observing that *Green* remains instructive in analyzing § 707(b)(3)(B)); *In re Mitchell*, Case. No. 10-00825-8-SWH, 2010 WL 5375954, *5 (Bankr. E.D.N.C. 2010) (finding that *Green's* analysis "remains good law"). "The Fourth Circuit's 'totality of the circumstances' test was adopted by name in BAPCPA § 707(b)(3)(B)," *In re Nockerts*, 357 B.R. 497, 505 (Bankr. E.D. Wis. 2006), as such, *Green's* explication of the totality of circumstances test provides valuable guidance for interpreting § 707(b)(3)(B).[5]

The USTE argues that the ability to pay creditors alone is a sufficient basis to dismiss a Chapter 7 case for abuse, absent other mitigating factors, and that the ability of the Debtors to repay their creditors is clearly present in this case. Before BAPCPA, *Green* and other courts generally relied on a debtor's ability to pay in determining substantial abuse. *See In re DeGross*, 272 B.R. 309, 312 (Bankr. M.D. Fla. 2001). The ability to pay remains a relevant consideration in the totality of circumstances test. *E.g.*, *In re Smith*, 2009 WL 4262842, *3 (holding that a debtor's ability to repay creditors "is a relevant consideration in determining whether abuse is present under § 707(b)(3)(B)"); *In re Crink*, 402 B.R. 159, 167 (Bankr. M.D.N.C. 2009) ("It is difficult to envision a situation where the totality of a bankruptcy debtor's financial situation does not include the debtor's ability to repay her debts."); *In re Wolf*, 390 B.R. 825, 833 (Bankr. D.S.C. 2008) (same). The relative weight courts should afford the ability to pay, however, remains an open question given the legal landscape on which the Fourth Circuit decided *Green*. The statutory presumption in favor of granting a debtor's Chapter 7 petition, which the *Green* court relied on, has been discarded by Congress in favor of a presumption of abuse for those debtors that fail the means test. *See Green,* 934 F.2d at 572 ("Nevertheless, in light of the statutory presumption that a debtor's Chapter 7 petition should be granted, solvency alone is not a sufficient basis for a finding that the debtor has

---

[5] This Court addressed *Green's* continued vitality post-BAPCPA and found that *Green* remains informative for totality of the circumstances analysis. *In re Smith*, 2009 WL 4262842, *4 n.5. Recently, the Fourth Circuit in *Calhoun v. United States Trustee (In re Calhoun)*, 650 F.3d 338 (4th Cir. 2011) considered a dismissal under § 707(b)(3)(B). The Fourth Circuit decided not to "make a determination as to the enduring applicability of the holding in *Green* . . . ." *Calhoun*, 650 F.3d. at 342.

6

in fact substantially abused the provisions of Chapter 7.").

While declining to abrogate the *Green* decision by holding that ability to pay alone is sufficient to find abuse, this court concludes that ability to pay may weigh significantly in the court's determination of abuse under § 707(b)(3)(B). Under pre-BAPCPA case law, the majority of cases held that the ability to pay was the primary factor to consider.[6] Reserving the ability to allocate more weight to this factor is in accord with pre-BAPCPA case law classifying the ability to pay as the prime consideration. Moreover, the impetus of BAPCPA was in part to ensure that debtors pay creditors the maximum they can afford. *See Ransom* 131 S.Ct. at 721. Therefore, retaining the discretion to assign more weight to the ability to pay factor, rather than make it a dispositive consideration, will help catch those debtors who can repay creditors while not disrupting the language of § 707(b)(3)(B) or the holding in *Green*.

The ability to repay creditors is generally evaluated by the amount a debtor would be able to commit to a hypothetical Chapter 13 plan. *E.g.*, *In re Crink*, 402 B.R. at 172; *In re Lenton*, 358 B.R. 651, 664 (Bankr. E.D. Pa. 2006). Because courts must consider a debtor's actual or anticipated ability to pay, a hypothetical Chapter 13 plan provides courts with a basic analog to determine a debtor's ability to repay creditors. *See In re Lipford*, 397 B.R. 320, 328 (Bankr. M.D.N.C. 2008) (endorsing a hypothetical Chapter 13 evaluation to analyze the debtor's future income, expenses, and financial situation). Post-petition changes to a debtor's financial circumstances – such as future income, expenses, and financial intentions – are essential to a determination of a debtor's "financial situation" as stated in § 707(b)(3)(B), and unlike the analysis regarding abuse pursuant to § 707(b)(2), a totality of the circumstances test is not a "snapshot" examination. Evaluating post-

---

[6] *See, e.g.*, *Stewart v. United States Trustee (In re Stewart)*, 175 F.3d 796, 809 (10th Cir. 1999) (agreeing that ability to pay is the primary factor to consider but that other aggravating factors must also be considered); *First USA v. Lamanna (In re Lamanna)*, 153 F.3d 1, 2 (1st Cir. 1998) (holding that ability to repay debts is not *per se* abuse, but not requiring "a court to look beyond the debtor's ability to repay if that factor warrants the result"); *Green,* 934 F.2d at 572 (commenting that the "majority of cases hold that the debtor's ability to repay is the *primary* factor to be considered.") (emphasis in original); *In re Walton*, 866 F.2d 981, 984-85 (8th Cir. 1989) (holding ability to pay standing alone is sufficient to dismiss); *Zolg v. Kelly (In re Kelly)*, 841 F.2d 908, 915 (9th Cir. 1988) ("[T]he debtor's ability to pay his debts when due as determined by his ability to fund a chapter 13 plan is the primary factor to be considered in determining whether granting relief would be substantial abuse . . . .").

7

petition events provides a realistic picture of the debtor's financial situation; indeed, examining income and expenses enables the court to construct an accurate depiction of the debtor's actual ability to pay and therefore carry out the overarching purpose of BAPCPA: to catch can-pay debtors. Post-petition events are therefore necessary to consider under § 707(b)(3)(B). *E.g.*, *In re Grinkmeyer*, Case No. 10-14881-BHL-7, 2011 WL 3292918, *4 (Bankr. S.D. Ind. 2011) (concluding that post-petition events should be assessed under § 707(b)(3)(B)); *In re Maya*, 374 B.R. 750, 754 (Bankr. S.D. Cal. 2007) (same).

In balancing the *Green* factors, this court holds that if debtors can repay a significant portion of their unsecured non-priority debt, it will hold substantial weight among the other *Green* factors. However, even an ability to pay a 100% dividend to unsecured creditors is not *per se* abuse.[7]  *See, e.g.*, *In re Mondragon*, Case No. 7-05-10665-MR, 2007 WL 2461616, *6 (Bankr. D.N.M. 2007); *In re Mestemaker*, 359 B.R. 849, 857-58 (Bankr. N.D. Ohio 2007). Instead, the ability to pay should be considered with the other *Green* factors. *In re Smith* 2009 WL 4262842, *4 ("Section 707(b)(3)(B) directs that the court must consider the 'totality of the circumstances,' which, by definition, encompasses both a debtor's ability to pay and other factors.").

Here, the Debtors have an ability to repay a significant portion of their unsecured debt. The Debtors' Schedule I indicates combined average monthly income of $9,020. Schedule J lists monthly expenses of $9,771, which leaves a monthly deficit of $751. Among the expenses stated on the Debtors' Schedule J is an expense on line 13b for "other expenses" in the amount of $2,801. The detailed expense attachment indicates that this payment consists of a first and second deed of trust and home owner association fees for the Charles Town property. In April 2010, the Debtors stopped making payments on the Charles Town property; in July 2010, the Debtors moved out of the house. By the time the Debtors filed bankruptcy on August 13, 2010, the Debtors effectively surrendered the Charles Town property. This court finds that under § 707(b)(3)(B), debtors may not

---

[7] Although the more debtors can repay to creditors the more likely the circumstances will tend to indicate abuse, the converse is not true. Debtors that can pay little of their unsecured debt does not necessarily mean abuse is less likely. *See In Re Praleikas,* 248 B.R. 140, 145 (Bankr. W.D. Mo. 2000) (highlighting that paying a lower percentage of debt does not mean a court will be less likely to find abuse because otherwise debtors could "be rewarded for having more debt, rather than less").

rely on mortgage payment expenses for property they surrender pre-petition. *E.g.*, *In re Maya*, 374 B.R. at 754; *In re Haar*, 373 B.R. at 500-01; *In re Henebury*, 361 B.R. at 613-14. In fact, the Debtors in this case are not even contractually obligated to make mortgage payments on the Charles Town property since Wells Fargo foreclosed on it in February 2011. Including these payments obfuscates the Debtors' current and prospective financial situation and therefore should be excluded.

The Debtors contend that their ability to pay is less than Schedule J reflects because it does not include a $600 monthly expense for psychiatric bills. The Debtors testified that they began incurring this monthly expense in February 2010. Although the Debtors failed to include this expense on line seven (medical and dental expenses) of Schedule J, the court must consider it to determine the Debtors actual ability to pay. Even considering this as an ongoing expense, however, the Debtors still have a positive monthly budget of $1,425.[8] This amount would allow the Debtors to repay 38% of their unsecured debt over a sixty-month period.[9] The Debtors stipulated, and stated at the evidentiary hearing, that they do not expect any substantial deviation in income for the foreseeable future. Accordingly, the Debtors' ability to pay a significant portion of their unsecured debt weighs heavily in demonstrating abuse.

Turning then to the factors identified in *Green*, the Debtors' testimony demonstrates that their petition was not filed as a result of sudden illness, calamity, disability, or unemployment. The Debtors explicitly testified that they filed their bankruptcy petition because of high credit card

---

[8] Removing the $2,801 expense from line 13b on Schedule J (the Charles Town property) and adding a $600 medical expense to line seven results in a positive monthly budget of $1,425.

[9] Disposable income of $1,425 over sixty months is $85,500. The Debtors have a total of $226,725 in unsecured debt: Schedule F lists $87,782 in unsecured nonpriority claims; Wells Fargo has a deficiency judgment for $138,943. Dividing the total unsecured debt by the Debtors' disposable income over sixty months results in an ability to pay approximately a 38% dividend.

Numerous courts consider the percentage payout to unsecured creditors in a hypothetical Chapter 13 as a yardstick in determining whether abuse exists. *See In re Lipford*, 397 B.R. at 328 n.4 (collecting cases on the different payout percentages courts believe tend to demonstrate abuse). While the court does not believe that a particular payout percentage holds some talismanic importance to indicate abuse, the court does find that the hypothetical percentage payout may factor significantly in the court's decision.

9

payments and because they wanted to move to Ashburn, Virginia.

Next, the USTE argues that the Debtors incurring approximately 50% of their credit card debt five years before filing bankruptcy establishes that they made consumer purchases far in excess of their ability to pay. A debtor's ability to repay consumer purchases and cash advances should be evaluated from the debtor's reasonable expectation of repayment when the debt was incurred. *In re Vansickel*, 309 B.R. 189, 211 (Bankr. E.D.Va. 2004). "Taken in the proper context, a court should examine the nature of the debts incurred, if the debts were consistent with the debtor's financial status, and whether there was an unexplained change in spending patterns . . . ." *In re Beitzel*, 333 B.R. 84, 91 (Bankr. M.D.N.C. 2005). Simply looking to the temporal proximity of the purchases to the petition date without more evidence about the nature and reasonableness of the purchases fails to indicate abuse. The Debtors' testified that their credit cards were used for travel, food, and the purchase of a $5,000 used motorcycle. The Debtors explained that the purchase of the motorcycle was to reduce travel expenses for work between West Virginia and Virginia, which was approximately fifty miles each way. Although a close question, duly considered, the court finds that the USTE failed to sufficiently prove the impropriety of these purchases, or other consumer purchases. The court finds this factor does not tend to demonstrate abuse.

The USTE also argues that the Debtors' monthly budget is unreasonable because their housing and food expenses are excessive based on the IRS allowances. A debtor's budget may be excessive based on high mortgage payments. *E.g.*, *In re Hornung*, 425 B.R. at 250; *In re Crink*, 402 B.R. at 171. According to IRS guidelines for a case filed between March 15, 2010 and October 31, 2010, the appropriate housing expense for a family of four in Jefferson County, West Virginia, was $1,103. The Debtors had monthly mortgage payments of $2,641 for the Charles Town property.[10] The Debtors' housing expense is 239% more than the IRS mortgage standard. Furthermore, the Debtors move to Loudoun County, Virginia, did not ameliorate their high housing expense. When the Debtors filed, the IRS housing and utility standard for a family of four in Loudoun County was

---

[10] The Debtors testified during the evidentiary hearing that they no longer pay any utilities for the Charles Town property. The utility expenses listed on Schedule J are for the Virginia rental. The court was not presented with utility expenses for the Charles Town property; as such, the court is only using the housing expense for the Charles Town property for purposes of comparison to the IRS standard.

10

$2,577. The Debtors' housing and utility expense in Loudoun County is $3,287. The Debtors' housing and utility costs remain high as compared to the means test guidelines.

Additionally, the USTE asserts that the Debtors' food expense of $1,200 is excessive. The IRS food allowance for a family of four is $752. The Debtors testified that their food expense was high because they ate out often due to the long commute between West Virginia and Virginia. But by the time the Debtors filed for bankruptcy they had already moved within six miles of their places of employment; thereby, relieving the need to eat out as much. The Debtors also argue that their food expense is reasonable because it includes other household items, such as cleaning supplies and toiletries. The Debtors argument seems to be corroborated by Schedule J, which does not list expenses for home maintenance, clothing, or laundry and dry cleaning. Notwithstanding the Debtors' food expense alone appears to be reasonable, the court still finds that this factor tends to indicate abuse given the excessiveness of the Debtors' other housing expenses.

The Debtors' schedules did not accurately reflect their true financial condition. The importance of accurate schedules is essential to the bankruptcy process. The trustee and creditors "should not be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight." *In re Tully*, 818 F.2d 106, 110 (1st Cir. 1987). The USTE argued that the Debtors should not have included their mortgage payments for the Charles Town property on Schedule J. Unlike Form 22A for calculating the means test, which dictates debtors list secured debts payments that are contractually due, Schedule J calls for "the *average or projected monthly* expenses of the debtor and the debtor's family at time case filed." (emphasis added). At the time of filing the petition, the Debtors had already moved out of the Charles Town property a month before with no intention of returning, and had not made a mortgage payment on the property in nearly five months. The mortgage payments were not expected to remain as an ongoing monthly living expense. The court finds this expense is not properly listed on Schedule J. *See In re Crawley*, 412 B.R. 777, 788-89 (Bankr. E.D. Va. 2009) (finding that the debtors' mortgage payments should not be listed on Schedule J when they had surrendered the house pre-petition because that expenses "was not expected to represent an ongoing monthly living expense"). *But see In re Randle*, 358 B.R. 360, 365-66 (Bankr. N.D. Ill. 2006) (noting that Schedule J should include mortgage payments of a debtor who intends to surrender a house post-petition). Finding otherwise would disrupt the purpose

11

of this factor: "Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the *true financial condition*." *Green,* 934 F.2d at 572 (emphasis added). The inaccuracy of the Debtors' Schedule J tends to demonstrate abuse.

The USTE does not allege bad faith and conceded as much during the evidentiary hearing. There is also no evidence of any bad faith in the record.

### III.  CONCLUSION

After balancing the ability to pay and all of the *Green* factors, the court believes that the Debtors have a responsibility to their creditors to make some effort to repay. Notably, the Debtors can make significant payments to their creditors *without* any additional belt-tightening. The Debtors' ability to repay weighs heavily in finding abuse, and the other *Green* factors further demonstrate that allowing them to proceed under Chapter 7 would constitute abuse. Accordingly, the court grants USTE's motion to dismiss for abuse under § 707(b)(3). A separate order will be entered contemporaneously with this memorandum opinion pursuant to Fed. R. Bankr. P. 9021.